IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Protect PT,                                  :
                                             :
                          Appellant          :
                                             :
              v.                             : No. 575 C.D. 2019
                                             : Argued: February 13, 2020
Penn Township Zoning Hearing          :
Board and Olympus Energy LLC          :


BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge (P.)
           HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE WOJCIK                              FILED: July 6, 2020


          Protect PT (Objector) appeals the order of the Westmoreland County

Court of Common Pleas (trial court) denying its appeal, and upholding the decision

of the Penn Township Zoning Hearing Board (Board), that granted the special

exception application of Olympus Energy LLC (Applicant)[1] to develop oil and gas

operations (unconventional gas wells)[2] at Applicant's Gaia Well Pad in Penn

---

[1] At the time of application, Applicant was Huntley & Huntley Energy Exploration, LLC (Huntley). However, by October 15, 2019 order, this Court granted Applicant's application to amend the caption of this appeal because Huntley changed its name to Olympus Energy LLC effective September 25, 2019.

[2] Section 190-202 of the Penn Township Zoning Ordinance Number 912-2016 (Zoning Ordinance) defines "Oil and Gas Operations (unconventional gas wells)," in pertinent part, as including "[w]ater and other fluid storage or impoundment areas used exclusively for . . . gas operations." Section 190-202 also defines "Wastewater (Unconventional Well)" as "[t]he post-drilling liquids or fluids used in the fracking or extraction process."

Township (Township), Westmoreland County, subject to a number of conditions. We affirm.

In 2017, Applicant filed an application for a special exception to develop unconventional gas wells on its 53.5-acre property located at 2002 Denmark Manor Road in the Township. The parcel is located in a Mineral Extraction Overlay (MEO) Zoning District[3] of the Township's Rural Resource

---

[3] Section 190-407(A) of the Township's Zoning Ordinance defines the purpose of the MEO Zoning District as follows:

> The purpose of the MEO [] District is to provide areas for the extraction of minerals as defined by the Commonwealth, where the population density is low and significant development is not projected for the near future. Uses permitted in the MEO District shall comply with the provisions of §190-635, Performance Standards, and §190-641, [Oil and Gas Operations (Unconventional Gas Wells),] as well as with the "Surface Mining Conservation and Reclamation Act," [Act of May 31, 1945, P.L. 1198, *as amended*, 52 P.S. §§1396.1-1396.31,] the "Noncoal Surface Mining Conservation and Reclamation Act," [Act of December 19, 1984, P.L. 1093, *as amended*, 52 P.S. §§3301-3326,] the "Oil and Gas Act," [58 Pa. C.S. §§3201–3274], and the "Bituminous Mine Subsidence and Land Conservation Act," [Act of April 27, 1966, P.L. 31, *as amended*, 52 P.S. §§1406.1-1406.21].

Additionally, Section 190-202 defines "Special Exception" as "[a] use which is subject to approval by the [Board] when there is a specific provision for such special exception made in this chapter." Section 190-407(E) specifically provides for "[o]il and natural gas drilling (unconventional)" as a permitted use by special exception in the MEO Zoning District.

Further, Section 190-407(G)(3), (4), and (9) provides:

> G. Development standards: In addition to the applicable performance standards in §190-635, any permitted . . . special exception . . . shall be subject to the following:

> \* \* \*

**(Footnote continued on next page…)**

(3) Wastewater: Copies of all required Pennsylvania [Department of Environmental Protection (DEP)] permits or permits from the Municipal Authority with jurisdiction agreeing to accept any effluent produced shall be provided that cannot be treated on-site[, which] shall not be permitted to accumulate and shall be disposed of on a regular basis as required.

\* \* \*

(4) Hazardous or toxic waste: Hazardous or toxic waste shall not be permitted to accumulate on any property, and disposal shall be in compliance with applicable Commonwealth of Pennsylvania hazardous or toxic waste handling regulations.

\* \* \*

(9) Air quality: Air-contaminant emissions shall comply with all municipal, county, commonwealth and federal regulations, and all applicable regulations for smoke, ash, dust, fumes, gases, odors and vapors.

Section 190-641(A), (C)(1), and (D) of the Township's Zoning Ordinance provides, in pertinent part:

A. Oil and gas operations, which include the drilling of . . . natural gas wells in the MEO [] District, . . . shall be reviewed and approved by the [Board] as a special exception prior to the issuance of any required Township permits.

\* \* \*

C. Where such oil and gas operations are classified as a special exception . . . the following review procedure and submittal information shall be provided and development standards met:

(1) An application for a special exception approval for a[] . . . gas operation which involves a[] . . . natural gas well,

**(Footnote continued on next page…)**

**(continued…)**

. . . shall be filed with the Director of Community Development along with the required administrative fee and such application shall include information as outlined and processed as follows:

* * *

(c) Disclose the special exception for which the application is being made, and show how the property, as it may be improved, meets the standards and criteria required for approval.

(d) Upon receipt of such application for special exception, the Director of Community Development shall forthwith refer the same to the [Board].  The application for special exception shall be processed as per the provisions of [Section 913.2 of] the Pennsylvania Municipalities Planning Code [(MPC), Act of July 31, 1968, P.L. 805, *as amended*, added by the Act of December 21, 1988, P.L. 1329, 53 P.S. §10913.2,] and §190-906 of this chapter.

* * *

(f) The [Board] may authorize a special exception pursuant to express standards and criteria specified in this chapter for said uses and may attach such additional conditions and safeguards as it may deem necessary where such conditions and safeguards are not pre-empted by [the Oil and Gas Act] as determined by Pennsylvania courts.

D. The applicant shall demonstrate that the drill site operations will not violate the citizens of Penn Township's right to clean air and pure water as set forth in Art[icle] 1, Sec[tion] 27, of the Pennsylvania Constitution[.]  The applicant shall have the burden to demonstrate that its operations will not affect the health, safety or welfare of the citizens of Penn Township or any other

**(Footnote continued on next page…)**

(RR) Zoning District.[4]  The following facts were found by the Board following a number of hearings on the application for a special exception.

The development will cover approximately 20.7 acres of the parcel and the Gaia Well Pad will be 350 feet by 500 feet.  The Gaia Well Pad will be located on the northern portion in accordance with the setback requirements.  The well site will be reached by taking U.S. Route 22 south on Harrison City-Export Road for 1.8 miles, then left on Denmark Manor Road to an 820-foot access road from Denmark Manor Road.  Harrison City-Export Road is a Westmoreland County-maintained road for the portion located in the Township and is maintained by the Municipality of Murrysville for a short distance from the Township line to U.S. Route 22.  Denmark Manor Road is maintained by the Pennsylvania Department of Transportation (PennDOT).

Applicant intends to drill 7 unconventional gas wells at the site in an initial 6- to 10-month development period.  Construction operations will occur during daylight hours with heavy equipment remaining on site during that period.

---

**(continued…)**

potentially affected landowner.  The application submitted shall include reports from qualified environmental individuals attesting that the proposed location will not negatively impact the Township residents' environmental rights; and will include air modelling and hydrogeological studies as potential pathways that a spill or release of fluid may follow.

[4] Section 190-402 of the Township's Zoning Ordinance defines the purpose of the RR Zoning District as, "to provide land for continuing agricultural operations, resource management, timber harvesting, outdoor recreation, public and private conservation areas, low-density single-family residential, and compatible support uses."

Approximately 7 to 10 truckloads of stone will be brought to the site per hour to construct the access road and the pad over a 7- to 10-day period.

The drilling phase will take 20 to 25 days per well over a 3- to 5-month period of time for 24 hours a day. The initial drilling phase will involve a short-term, several-day increase in heavy traffic volume, which will peak at approximately 10 vehicles per hour. Once the wells are open, the fracking segment of the completion phase will cause a second increase in heavy vehicle traffic to bring the necessary equipment to the site. This will involve sand truck traffic at 25 vehicles per day for the 7- to 10-day fracking period for each well. Applicant intends to introduce a dust control protocol to dispense fracking sand that will involve the creation of vacuums to minimize the accidental release of sand or dust generated by the process. Truck trips to the site will reduce significantly during the actual drilling operations, primarily involving vehicles transporting well casings and cement trucks used for the casing installation.

The chemicals stored onsite will include drilling mud, friction reducer, and the chemicals used in the fracking process, which will be protected with secondary containment in addition to their primary containers. The chemicals will be removed from the site once the drilling and completion phases are over.

Wastewater, also known as "flowback" or "produced" water, will be collected during the completion phase in a 500-barrel "lay-down" tank. No wastewater treatment will occur on site and it will be removed by trucks to be reused at other well sites or transported to an approved treatment facility. Produced water removal will require 15 to 20 trucks per day for approximately 30 days after which the volume required for disposal will decrease to a few trips per day and then to a few per month during the production life of the site.

6

Applicant submitted Air and Hydrogeologic Reports prepared by Morris Knowles, Civil Engineering Consultants, and Trinity Consulting, regarding accidental releases of fluids and accompanying emissions with respect to the constitutional requirements referenced in Section 190-641(D) of the Township's Zoning Ordinance governing the Township citizens' right to clean air and water. *See* Reproduced Record (R.R.) at 563a-637a, 638a-665a. The Board accepted Nathan Garlitz of Morris Knowles and Thomas Walsh of Trinity Consulting as experts. Garlitz and Walsh completed the Reports and each study presumed a catastrophic failure of containment on the site, which is a rare event, and indicated the pathways such a release would follow. Their studies found that no reasonable groundwater pathways for a spill or release of fluid at the site would generate a risk of toxic exposure to the surrounding area including groundwater sources.

Applicant also offered the testimony of Jennifer Hoffman, its Vice President of Health, Safety and Regulatory Procedures. She testified that the flowback water and produced water are regulated liquids that DEP classifies as "Residual Waste" as provided in the Solid Waste Management Act (SWMA).[5] She stated that these fluids are not considered to be "hazardous wastes" as defined in Section 103 of the SWMA,[6] and are consistent with brine or saltwater. Likewise,

_____

[5] Act of July 7, 1980, P.L. 380, *as amended*, 35 P.S. §§6018.101-6018.1003.

[6] 35 P.S. §6018.103. Section 103 of the SWMA defines "Residual Waste," in relevant part, as "[a]ny garbage, refuse, other discarded material or other waste including solid, liquid, semisolid, or contained gaseous materials resulting from industrial, mining and agricultural operations." In turn, Section 103 defines "Hazardous Waste," in pertinent part, as:

> Any . . . discarded material including solid, liquid, semisolid or contained gaseous material resulting from . . . commercial, industrial, [or] mining . . . operations, . . . which because of its

**(Footnote continued on next page…)**

7

Walsh, of Trinity Consulting, stated that a release of wastewater would act no differently than a similar volume of freshwater.

Applicant also offered the testimony of Ian Donaldson (Donaldson) of Trinity Consulting, who was accepted by the Board as an expert in air dispersion modeling. He conducted air dispersion modeling using the United States Environmental Protection Agency (EPA) AERSCREEN model, a single-source model using a wide array of meteorological data and downwind receptors. He determined that the evaporative emission rates associated with the several onsite liquids were less than any short-term benchmarks indicating a hazard to public health, safety, or welfare.

Finally, Applicant offered the testimony and report of Dr. Christopher Long (Long), a Board Diplomate toxicologist with doctoral degrees in Chemistry, Environmental Engineering, and Environmental Health. He was accepted by the Board as an expert in these fields, and testified that he routinely prepares analyses and renders opinions regarding human health risks in his position with Gradient, an environmental consulting firm. He testified regarding the potential health effects from unconventional gas wells, basing his opinion on peer-approved studies,

---

**(continued…)**

> quantity, concentration, or physical [or] chemical . . . characteristics may:
>
> > (1) cause or significantly contribute to an increase in mortality or an increase in morbidity in either an individual or the total population; or
> >
> > (2) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, disposed of or otherwise managed.

empirical government datasets, government reports, and commissioned studies regarding air quality impacts in the Marcellus Shale region, including air monitoring data collected near oil and gas drilling operations in the region. *See* R.R. at 808a-921a. He testified, within a reasonable degree of scientific certainty, that the data compiled in a large body of monitoring studies concerning air quality and the potential for harm from unconventional gas well drilling does not support claims that public health concerns exist through normal and typical operations.

Objector presented the testimony of Dr. Walter Tsou (Tsou), an M.D. with a bachelor's degree in Chemistry and a master's degree in Public Health, who is the Executive Director of Physicians for Social Responsibility, as an expert in public health issues. *See* R.R. at 501a-522a. Tsou was the author of a resolution adopted by the Pennsylvania Medical Society urging a moratorium on unconventional gas and oil development in the Commonwealth. He expressed general concerns regarding the lack of baseline information that would assist in determining the public health impact generated by unconventional gas drilling based on his review of surveys analyzing information that was primarily self-reported by individuals near unconventional gas well sites.

Objector also presented the testimony of Dr. Lawrence Irr, who has a doctoral degree in Chemistry, and has completed post-doctoral work in engineering and was accepted by the Board as an expert in Chemistry and the safe handling of chemical substances. He expressed concerns regarding the manner of storage of hazardous chemicals at the site, the lack of information regarding the materials used to construct storage vessels and the containment protocol for the Gaia Well Pad site. *See* R.R. at 494a-500a.

9

Several residents also testified, outlining their concerns regarding truck traffic, hazards to well water, the lighting and vibrational impacts, and other concerns. Other residents testified in favor of the special exception application to undertake unconventional gas drilling at the Gaia Well Pad, and in general throughout the Township.

On April 12, 2018, the Board issued a decision disposing of the application for a special exception to develop unconventional gas wells at the Gaia Well Pad. *See* R.R. at 471a-492a. Contrary to Objector's assertion, the Board concluded that "[t]he accumulation and temporary storage of wastewater, which includes flowback and produced water, at the site throughout all phases of development, including the long-term production phase, does not violate the provisions of Section 190-635 [of the Zoning Ordinance] precluding the unenclosed storage of flammable, hazardous or toxic fluids of more than 500 gallons." *Id.* at 488a-489a. The Board also concluded, "Applicant, in its application and through evidence submitted at the time of hearing . . . has satisfied the conditions of Article VI, §190-641(B)," and "has provided an adequate description of the property location, proposed use of the site and met other requirements as set forth in Article VI, §190-641(C)." *Id.* at 489a.

Further, the Board concluded:

> The normal operations associated with the proposed use, while presumed consistent with health, safety and welfare, also create issues of excessive lighting, noise and some air quality issues, especially during the period of 24-hour periods of operation that have been demonstrated to interfere with the general welfare of the surrounding residents, requiring the imposition of certain conditions.

10

R.R. at 489a. Nevertheless, the Board concluded, "Applicant has produced evidence to show that its operation, subject to certain conditions, will satisfy the requirements of Article VI, §190-641(D) of the Ordinance and Article I, Section 27 of the Pennsylvania Constitution," and that Objector "failed to establish sufficient, credible evidence that if [] Applicant has been found to have met the Ordinance requirements and the application is granted, with conditions, that the said use would create a high probability that an adverse, abnormal or detrimental effect will occur to public health, safety and welfare." *Id.*

Accordingly, the Board issued the decision granting the application for a special exception subject to a number of conditions. R.R. at 490a-492a.[7]

---

[7] Specifically, the Board imposed the following conditions:

1. The Applicant shall submit its [DEP-]approved Radiation Action Monitoring Plan to the appropriate Township department prior to the issuance of any permit.

2. The Applicant shall provide all third-party permits to the Township prior to the construction and drilling of the well site.

3. The Applicant shall construct and maintain standard physical barrier[s], commonly referred to as "sound walls" on all sides of the Pad which will provide for the absorption and mitigation of sound, light and airborne materials, if present, emanating from the drilling, completion and onsite pipeline connection of [unconventional] gas wells. Such barriers will be assembled and constructed on the Pad following construction and vegetation of the Pad, and will remain in place during the mobilization, drilling, completion and demobilization activities taking place on the Pad. Following commencement of gas production, the barriers may be removed by the Applicant. In the event that the Applicant engages in the separate and non-consecutive drilling, completion or turn-to-sales activity, it may disassemble the barriers between each activity, but must reassemble the barriers prior to the commencement of each activity.

**(Footnote continued on next page…)**

11

(continued…)

4. The Applicant shall participate in and pay for third-party noise monitoring during the construction, drilling and completion stages of development. Thirty (30) days prior to the commencement of construction of the Gaia [Well] Pad, the Applicant and the Township shall select an industry-accepted noise specialist from a list of five qualified industry experts developed by the Applicant. The selected noise specialist shall take baseline measurements for the Gaia [Well] Pad. During construction, drilling and completion of the Pad, the noise specialist shall conduct active monitoring at the property line nearest the Applicant's limit of disturbance once every three (3) days. The Township may contact the noise specialist and direct the noise specialist as to the specific time for the active monitoring in each three-day interval. The results of the monitoring shall be available upon the Township's request. The noise specialist shall notify the Applicant and the Township if the monitoring shows results attributable to the Applicant's oil and gas operations above any applicable performance standard. The parties agree that the temporary movement of vehicle to and from the site shall not be included in the noise monitoring. The Applicant shall also maintain a log of on-site monitoring conducted for [the Occupational Safety and Health Administration (OSHA) of the federal Department of Labor] purposes and shall notify the Township of any reading beyond the sound barriers showing the Applicant's operations above 90 decibels for a period in excess of two (2) hours.

5. To the extent permitted by Pennsylvania laws and regulations as defined by the DEP, the Applicant shall plant and vegetate the Gaia [Well] Pad in consultation with the Township to provide for the visual enhancement of the Pad in concert with surrounding vegetation.

6. The Applicant shall establish and maintain a 24-hour emergency hotline telephone number to be used by the Township representatives, employees, contractors and the volunteer fire companies to directly contact employees and contractors of the Applicant in the event of an emergency.

(Footnote continued on next page…)

12

**(continued…)**

7. The Applicant shall participate with or agree to the monitoring of air quality emissions and particulate content during drilling and completion activities. The Applicant will agree to pay for third-party monitoring and testing from a mutually acceptable expert with experience in this industry. The expert shall take baseline readings at the Gaia [Well] Pad. The expert shall engage in active monitoring twice a week on the Pad. Testing locations shall be established on relevant parcel or leasehold boundaries but, in all events, the only location that will be used for air monitoring located within the Applicant's established limit of disturbance shall be situated at the access road entrance. No other air monitoring equipment will be located within the Applicant's limit of disturbance including, but not limited to, the Pad or associated stormwater or erosion and sedimentation control facilities. The Applicant will notify the Township if any monitoring for OSHA emissions requirements at the site exceed OSHA standards. In the event that a DEP[-]reportable spill or any spill that is reported to the DEP by the Applicant occurs at the Pad site, the Township may require immediate air monitoring until the spill is abated or remediated. Other than in emergency situations, the Applicant will not flare or incinerate natural gas at the Poseidon Pad during completion or flowback operations and the Applicant will comply with all state and federal regulations applicable to emissions relating to its operations on the Pad. This condition shall conclusively establish compliance with §190-407(G)(9) and also show compliance with §190-641(D).

8. In conjunction with the aforementioned physical barriers, the Applicant shall mitigate direction or deflection of light sources off the Gaia [Well] Pad, including b[ut] not limited to [the] use of low-glare lighting sources, light shields and low vertical profile lighting equipment. Upon request by the Township, the Applicant will meet with the Township to take steps to further mitigate special instances of complaints regarding the Applicant's light sources. In all circumstances, the Applicant will have the right to take any and all steps to ensure that work surfaces will be proper[ly] lit to provide for a safe workspace for its workers and contractors.

**(Footnote continued on next page…)**

Objector appealed the Board's decision to the trial court, which denied the appeal and affirmed the Board's decision without taking additional evidence. Objector then filed the instant appeal of the trial court's order.[8]

## I.

As a preliminary matter, this Court has recently stated the following in a similar case involving the same Objector appealing the same Board's grant of the special exception applications of another company to develop a number of other unconventional gas well sites in the Township:

> A special exception is neither special nor an exception, but rather a use expressly contemplated that evidences a legislative decision that the particular type of use is consistent with the zoning plan and presumptively consistent with the health, safety and welfare of the

---

**(continued…)**

> 9. The Applicant shall take all necessary steps to ensure that no trucks or construction vehicles will be staged or queued on any public roads within the Township. The Applicant will consult with the local School District to coordinate and minimize truck traffic during regularly scheduled school bus stops. The Applicant will follow the requirements of the Diesel-Powered Motor Vehicle Idling Act[ (Vehicle Idling Act), Act of October 9, 2008, P.L. 1511, 35 P.S. §§4601-4610,] to minimize unnecessary idling on the Pad. The Applicant will inspect and ensure that all vehicles utilized on the Gaia [Well] Pad will maintain all required certifications and permits applicable to such vehicles.

R.R. at 490a-492a.

[8] Because the parties presented no additional evidence to the trial court, our review is limited to determining whether the Board committed an abuse of discretion or an error of law. *Taliaferro v. Darby Township Zoning Hearing Board*, 873 A.2d 807, 811 n.1 (Pa. Cmwlth. 2005) (citation omitted).

14

community. Further, as [the author of a treatise] explains:

> Zoning boards often hear protestants argue that an applicant for a special exception should be required to observe the law as set forth in the zoning ordinance. That argument is appropriate in an application for a variance, but not in a case involving a special exception. The applicant for an exception is following the zoning ordinance. His application is one envisioned by the ordinance and, if the standards established by the ordinance are met, his use is one permitted by its express terms.

An applicant for a special exception has both the duty of presenting evidence and the burden of persuading the [Board] that its proposed use satisfies the objective requirements of the zoning ordinance for the grant of the special exception. Once the applicant meets its burdens of proof and persuasion, a presumption arises that the proposed use is consistent with the health, safety and general welfare of the community. The burden then normally shifts to the objectors to present evidence and persuade the [Board] that the proposed use will have a generally detrimental effect on health, safety and welfare. The evidence presented by the objectors must show, to a high degree of probability, that the use will generate adverse impacts not normally generated by this type of use and that these impacts will pose a substantial threat to the health and safety of the community.

Further, this Court [has] outlined the rules regarding the "initial evidence presentation duty (duty) and persuasion burden (burden) in special exception cases" as follows:

> *Specific requirements*, e.g., categorical definition of the special exception as a use type or other matter, and objective standards governing such matter as a special exception and generally:
>
> The applicant has both the duty and the burden.

15

*General detrimental effect*, e.g., to the health, <u>safety and welfare of the neighborhood</u>:

Objectors have both the duty and the burden; the ordinance terms can place the burden on the applicant but cannot shift the duty.

*General policy concern*, e.g., as to harmony with the spirit, intent or purpose of the ordinance:

Objectors have both the duty and the burden; the ordinance terms cannot place the burden on the applicant or shift the duty to the applicant.

[We have] further explained the requirement that an applicant bears the burden of both persuasion and the initial duty to present evidence "to show that the proposal complies with the 'terms of the ordinance' which expressly govern such a grant." This rule means the applicant must bring the proposal within the specific requirements expressed in the ordinance for the use (or area, bulk, parking or other approval) sought as a special exception. Those specific requirements, standards or "conditions" can be classified as follows:

1. The kind of use (or area, bulk, parking or other approval)—i.e., the threshold definition of what is authorized as a special exception;

2. Specific requirements or standards applicable to the special exception—e.g., special setbacks, size limitations; and

3. Specific requirements applicable to such kind of use even when not a special exception—e.g., setback limits or size maximums or parking requirements applicable to that type of use whenever allowed, as a permitted use or otherwise.

16

*Protect PT v. Penn Township Zoning Hearing Board and Apex Energy (PA), LLC* (Pa. Cmwlth., Nos. 39-42 C.D. 2018, filed November 8, 2018) (*Apex*), slip op. at 7-9 (citations omitted and emphasis in original).[9]

## II.

On appeal, Objector first claims that the Board erred in determining that development of the Gaia Well Pad would not create a high probability of adverse, abnormal, or detrimental effects on public health, safety, and welfare based on related increased traffic and air emissions during its development and operation. Specifically, Objector contends that in its decision, the Board concluded that operations at the Gaia Well Pad will "create issues of excessive lighting, noise and some air quality issues, especially during the period of 24-hour [] operation[s], [which] have been demonstrated to interfere with the general welfare of the surrounding residents." R.R. at 489a. Nevertheless, the Board granted the special exception application even though Applicant's evidence demonstrates the alarming number of vehicle trips that will be associated with the construction and operation of the Gaia Well Pad.

The evidence shows that vehicle traffic for the Gaia and Metis Well Pads will use the same truck route along Harrison City-Export Road. R.R. at 146a. Over the period of development (475 days), the total traffic includes 3,295 Class 3 vehicle trips, 11,091 Class 6 and 7 vehicle trips, and 6,445 Class 10 vehicle trips. *Id.* at 540a. This heavy traffic will return every time Applicant returns to the site

---

[9] *See* Section 414(a) of this Court's Internal Operating Procedures, 210 Pa. Code §69.414(a) ("Parties may also cite an unreported panel decision of this court issued after January 15, 2008, for its persuasive value, but not as binding precedent.").

17

to drill new wells. Thus, the increase in traffic associated with the proposed use bears a substantial relation to the health and safety of the community and there is a high degree of probability that this traffic will affect the health and safety of the community. Because Objector pointed to evidence of traffic counts and hazardous road conditions, it met its burden of proving that the proposed use will generate traffic that threatens health and safety. One of its members testified regarding the unsafe road conditions. *See* R.R. at 31a-32a. Objector asserts that the Board capriciously disregarded this evidence in concluding otherwise.

Additionally, Objector claims that as a result of the close proximity of the well pad to residences, less than one kilometer, the community will suffer detrimental health effects due to air emissions emanating from the Gaia Well Pad. Dr. Tsou testified that its construction and operation will result in air emissions and significantly increased exposure to volatile organic compounds such as ozone and particulate matter that is not usually experienced in the Township. R.R. at 320a-321a. He testified that all individuals and businesses within this proximity will be adversely impacted by the development. *Id.* at 370a. He also testified that children are much more prone to the effects of environmental toxins. *Id.* at 268a-269a. Applicant's expert, Dr. Long, did not attempt to estimate, quantify, or model the emissions from the sources at the Gaia Well Pad and admitted that he could not say which pollutants would be emitted at the site or at what rate or duration they may be emitted. Notes of Testimony (N.T.) 2/8/18 at 134:23-135:22. In contrast, Dr. Tsou presented specific evidence regarding the potential negative public impacts of air emissions from the Gaia Well Pad operations that the Board did not address and again capriciously disregarded.

However, as we have previously stated:

[T]his Court may not substitute its interpretation of the evidence for that of the [B]oard. It is the function of [the Board] to weigh the evidence before it. The [B]oard is the sole judge of the credibility of witnesses and the weight afforded their testimony. Assuming the record contains substantial evidence, we are bound by the [B]oard's findings that result from resolutions of credibility and conflicting testimony rather than a capricious disregard of evidence.

[The Board] is free to reject even uncontradicted testimony it finds lacking in credibility, including testimony offered by an expert witness. It does not abuse its discretion by choosing to believe the opinion of one expert over that offered by another.

*Taliaferro v. Darby Township Zoning Hearing Board*, 873 A.2d 807, 811 (Pa. Cmwlth. 2005) (citations omitted).

As in *Apex*, in this case the Board found that Objector has "failed to establish sufficient, credible evidence that if . . . the application is granted, with conditions, that the said use would create a high probability that an adverse, abnormal or detrimental effect will occur to public health." R.R. at 489a. The Board "did not credit Objector's expert or lay testimony regarding the purported adverse impacts occasioned by Applicant's proposed uses, and this Court cannot revisit the [Board's] determinations as to credibility and evidentiary weight on appeal." *Apex*, slip op. at 27-28 (citation omitted).

As noted above, with respect to the increased traffic, the Board found as fact: (1) "the proposed traffic route proceeds from U.S. Route 22 south on Harrison City-Export Road 1.8 miles then left on to Denmark Manor Road until [the] site access road is reached;" (2) "Harrison-City Export Road is county maintained for the portion located in [the Township] and maintained by the Municipality of Murrysville for the short distance from the Township line to U.S.

19

Route 22;" (3) "Denmark Manor Road is a state maintained road;" (4) "Applicant will enter into any required access maintenance agreements, including appropriate bonding as may be required, with the Township and PennDOT;" (5) "[t]he initial portion of the drilling phase will involve the transport and erection of drilling equipment requiring a short-term, several-day increase in heavy truck traffic which will peak at approximately 10 vehicles per hour;" (6) "[t]ruck trips for the site will be reduced significantly during the actual drilling operations, primarily vehicles carrying well casing and cement trucks used for the casing installation;" (7) "Applicant will maintain a maintenance program for the Gaia [Well Pad] access route including the watering of roadways to minimize dust production, coordination of vehicle movement with the school district and prevent the stacking or queuing of vehicles on public roadways;" (8) "Applicant intends to hold monthly meetings with vendors and subcontractors to insure compliance with the vehicle plans and determine logistics or implementation, including routes and timing;" and (9) "Special meetings with these groups will be called on an as needed basis and quarterly reviews will take place with individual vendors."  R.R. at 473a, 474a-475a, 477a-478a.[10]

---

[10] Objector does not argue that the Board's findings are not supported by substantial evidence; rather, Objector points to the evidence submitted in opposition to the application and asserts that the Board capriciously disregarded it.  However, as indicated above, the uncontested Board findings are binding on appeal to this Court.  *Taliaferro*, 873 A.2d at 811.  *See also Frederick v. Allegheny Township Zoning Hearing Board*, 196 A.3d 677, 688 (Pa. Cmwlth. 2018), *appeal denied*, 208 A.3d 462 (Pa. 2019) ("Objectors do not assert that the [] Board's findings of fact are not supported by substantial evidence; they do not challenge its factual findings on any ground.  They are binding on this Court."); *Apex*, slip op. at 27-28 ("The [Board] did not credit Objector's expert or lay testimony regarding the purported adverse impacts occasioned by Applicant's proposed uses, and this Court cannot revisit the [Board's] determinations as to credibility and evidentiary weight on appeal.") (citation omitted.)  Further:

**(Footnote continued on next page…)**

Moreover, as outlined above, the Board imposed the following condition in its approval:

[]Applicant shall take all necessary steps to ensure that no trucks or construction vehicles will be staged or queued on any public roads within the Township. []Applicant will consult with the local School District to coordinate and minimize truck traffic during regularly scheduled school bus stops. []Applicant will follow the requirements of the [Vehicle Idling Act] to minimize unnecessary idling on the Pad. []Applicant will inspect and ensure that all vehicles utilized on the Gaia [Well] Pad will maintain all required certifications and permits applicable to such vehicles.

R.R. at 492a.

The evidence that Objector relies on relating to the Gaia Well Pad development is not a basis upon which to deny the special exception application. *See Frederick v. Allegheny Township Zoning Hearing Board*, 196 A.3d 677, 689 (Pa. Cmwlth. 2018), *appeal denied*, 208 A.3d 462 (Pa. 2019) ("[Z]oning 'regulates the *use* of land and not the particulars of development and construction.'") (emphasis in original and citations omitted). Further, with respect to the purported traffic during site operations, as we explained in *Apex*, "'[a]n increase in traffic is

**(continued…)**

[A]pplication of the capricious disregard standard here does not warrant reversal. The Board's decision plainly demonstrates it did not deliberately ignore the testimony of Objectors' experts as evidenced by its express summation of their testimony. Rather, the Board considered their testimony, and chose to reject it. The express consideration and rejection of this evidence, by its definition, is not capricious disregard.

*Taliafarro*, 873 A.2d at 815-16 (citations omitted).

21

generally not grounds for denial . . . *unless there is a high probability that the proposed use will generate traffic not normally generated by that type of use* and that the abnormal traffic threatens safety,'" and "[h]ere, Objector did not present sufficient evidence to meet its burden on this issue." *Id.*, slip op. at 28, 29 (emphasis in original and citations omitted). In sum, Objector failed to present sufficient credible evidence to the Board that the proposed use while the Gaia Well Pad is in operation "will generate traffic not normally generated by that type of use" and, as a result, the Board did not err in granting the application on this basis. *Id.*

With respect to the purported air quality issues, the Board summarized Donaldson's testimony as follows:

> []Donaldson and his firm conducted air dispersion modeling using the [EPA] AERSCREEN model, a single[-]source model that uses a wide array of meteorological data and downwind receptors and other data sources to determine that the evaporative emission rates associated with the several different onsite liquids [are] less tha[n] any short-term benchmarks that would indicate a hazard to public health, safety or welfare.

R.R. at 479a-480a.

In addition, the Board summarized Long's testimony as follows:

> []Long testified, within a reasonable degree of scientific certainty, that based upon a large body of monitoring studies concerning air quality and potential for harm from the normal and typical operations required for unconventional gas well drilling, that the data compiled from these studies and reports does not support claims that public health concerns exist through the normal and typical operations.

R.R. at 481a.

Moreover, as outlined above, the Board imposed the following condition in its approval of the application:

> []Applicant shall participate with or agree to the monitoring of air quality emissions and particulate content during drilling and completion activities. []Applicant will agree to pay for third-party monitoring and testing from a mutually acceptable expert with experience in this industry. The expert shall take baseline readings at the Gaia [Well] Pad. The expert shall engage in active monitoring twice a week on the Pad. . . . []Applicant will notify the Township if any monitoring for OSHA emissions requirements at the site exceed OSHA standards. In the event that a DEP[-]reportable spill or any spill that is reported to the DEP by []Applicant occurs at the Pad site, the Township may require immediate air monitoring until the spill is abated or remediated. . . . Applicant will comply with all state and federal regulations applicable to emissions relating to its operations on the Pad. This condition shall conclusively establish compliance with §190-407(G)(9) and also show compliance with §190-641(D).

R.R. at 491a. Further, the Board required Applicant to "establish and maintain a 24-hour emergency hotline telephone number to be used by the Township representatives, employees, contractors and the volunteer fire companies to directly contact . . . Applicant in the event of an emergency." *Id.*

Again, as we explained in *Apex*:

> Unlike in those cases where the fact-finders *credited* evidence that the proposed uses would adversely impact the public health, safety, and welfare, the [Board] here found that Objector did *not* prove that Applicant's proposed uses would create a high probability of an adverse, abnormal or detrimental effect to public health, safety and welfare.
>
> Further, as explained above, the [Board's] supported determinations reveal that Applicant satisfied

23

> Section 190-641(D) of the zoning ordinance (relating to the health, safety and welfare of the Township's citizens or any other potentially affected landowner). And, as stated above, in granting the . . . requested special exception[], the [Board] attached several detailed conditions aimed at mitigating Objector's concerns over potential adverse effects, such as noise, lighting, air quality, and truck traffic, associated with Applicant's proposed use[]. The [Board] also attached a condition that requires Applicant to establish and maintain a 24-hour emergency hotline telephone number to allow for reporting of any emergencies that may occur.

*Id.*, slip op. at 29-30 (emphasis in original and citations omitted). In sum, Objector failed to present sufficient credible evidence to the Board that the proposed use while the Gaia Well Pad is in operation will generate air emissions creating a high probability of adverse, abnormal, or detrimental effects on the public health, safety and welfare not associated with the approved use and, as a result, the Board did not err in granting the application on this basis. *Id.*

**III.**

Objector next claims that the Board erred in determining that development of the Gaia Well Pad would not create a high probability of adverse, abnormal, or detrimental effects on public health, safety, and welfare or change the character of the community based on the cumulative impacts of its development in close proximity and time to other well pads in the community. Objector presented a map to visually track all of the unconventional wells and their proximity to schools, day care centers, and recreational facilities, which shows that the Gaia Well Pad is in the heart of a largely residential area. *See* R.R. at 8a-9a, 11a, 493a.

Objector also contends that Applicant failed to present an explicit schedule for development of the well at the site so the Board could not sufficiently

24

evaluate the aggregate impact of multiple developers constructing and using multiple wells in the Township. Tsou testified that "the cumulative effect of the increasing number of well pads is only going to compound the health impact from each of the well pads." R.R. at 270a. The community will be detrimentally impacted by the changing character of the neighborhood from residential use to heavy industrial use. A witness testified that Applicant may develop 15 to 18 wells at the site of the Gaia Well Pad, that there will be multiple trips over time to develop them, and that Applicant hopes that the well will stay in production for 30 to 50 years. *Id.* at 147a, 149a, 156a. Two of Objector's members testified as to the residential nature of their community and the changes that would result from Applicant's well activities. N.T. 11/9/17 at 36:20-37:5; R.R. at 23a. Thus, Objector contends, it presented evidence regarding how the proposed development of the Gaia Well Pad would significantly alter the neighborhood's character and the detrimental effects that would ensue thereby meeting its burden of proof, and asserts that the Board again capriciously disregarded this evidence.

However, Objector bases its argument in this regard on evidence that, as outlined above, the Board specifically rejected as not credible, and ignores the Board's determination that "Object[or] ha[s] failed to establish sufficient, credible evidence that if [] Applicant has been found to have met the Ordinance requirements and the application is granted, with conditions, that the said use would create a high probability that an adverse, abnormal or detrimental effect will occur to public health, safety and welfare." R.R. at 489a.[11] In rejecting this claim below, the trial court explained:

---

[11] Again, the uncontested Board findings are binding on appeal to this Court, and the Board's credibility determination regarding Objector's evidence does not constitute a capricious **(Footnote continued on next page…)**

Looking to [Objector's] assertion that the community will be detrimentally affected by the cumulative effects of multiple unconventional natural gas wells in close proximity, [Objector] points to a map submitted at the hearing which plots out all unconventional natural gas wells planned in [the] Township, along with points of interest such as schools and homes of [its] members. [Objector] points out that Dr. Tsou testified that "the cumulative effect of the increasing number of well pads is only going to compound the health impact from each of the well pads." [R.R. at 270a]. [Objector] initially notes that the Gaia well pad is located in what it considers a highly residential area.

[Applicant] points out, and this Court agrees, that [Objector] failed to provide any non-speculative evidence that the proposed well pads will produce adverse impacts "not normally generated by this type of use." As such, [Objector] has failed to meet the burden of proof required to show a detriment caused by the proximity of various unconventional natural gas wells, as is required. No capricious disregard of any evidence regarding proximity of wells is apparent here.

Trial Court 4/9/19 Opinion at 11.[12] We discern no trial court error in this regard.

---

**(continued…)**

disregard of the evidence that was presented by the parties. *Frederick*, 196 A.3d at 688; *Taliaferro*, 873 A.2d at 815-16; *Apex*, slip op. at 27-28.

[12] Like the trial court, we rejected a similar argument that Objector raised in *Apex* and distinguished the authority Objector cites herein stating, in relevant part:

[T]he [Board's] findings that Objector did not prove that Applicant's proposed uses would adversely impact public health, safety, and welfare, contrast this case with *Hogan, Lepore & Hogan v. Pequea Township Zoning Board*, 638 A.2d 364 (Pa. Cmwlth. 1994), *disapproved of on other grounds by Wistuk v. Lower Mt. Bethel Township Zoning Hearing Board*, 925 A.2d 768 (Pa. 2007), and *Blair v. Board of Adjustment of Borough of*

**(Footnote continued on next page…)**

26

In *Marr Development Mifflinville, LLC v. Mifflin Township Zoning Hearing Board*, 166 A.3d 479 (Pa. Cmwlth. 2017), the owner of a 5.85-acre parcel of property in Mifflin Township's Suburban Residential (RS) Zoning District applied for a special exception to subdivide the parcel into 12 lots to construct duplexes on 11 of the lots with an existing single-family dwelling on the remaining lot. There were 17 existing detached single-family dwelling units on the property, so the proposed development would double the number of dwelling units on the parcel. Under the relevant zoning ordinance, the purpose of the RS Zoning District was "'to promote and encourage a suitable and safe environment for family life by providing only for single[-]family residences and residential support land uses.'" *Id.* at 481. The ordinance provided for single-family detached dwellings as a permitted use while attached dwellings were limited to two dwelling units and were only permitted by special exception. Ultimately, the zoning hearing board determined that the objectors had met their burden of proving that "'the proposed use presents a project which is not consistent or compatible with the existing and adjoining land uses that were and have been developed for single family residential structures and not duplex units.'" *Id.* at 482. On appeal, the common pleas court affirmed the board's decision.

_____

**(continued…)**

> *Hatboro*, 169 A.2d 49 (Pa. 1961), cited by Objector. Unlike in those cases where the fact-finders *credited* evidence that the proposed uses would adversely impact the public health, safety, and welfare, the [Board] here found that Objector did *not* prove that Applicant's proposed uses would create a high probability of an adverse, abnormal or detrimental effect to public health, safety, and welfare.

*Id.*, slip op. at 29 (emphasis in original).

27

On further appeal, this Court reversed stating, in pertinent part:

> The Board also claimed the project would double the number of existing units in a one-block area and, therefore, is "more intense." This conclusion improperly concentrates solely on the impact on the immediate one-block area, without regard for the "community at large" or any of the other factors expressed in [the relevant section] of the Ordinance. It also does not address that across the street from the proposed project are an operating mill, a fire hall, a cemetery, and a 20–unit apartment complex. Moreover, the Board's contention that the proposed use is "more intense" is undercut by the fact that the 12 proposed lots all meet the setback and lot dimension requirements. In a[nother] case involving the same Board, we reversed its denial of a special exception for a mobile home court. Like here, we said the force of the Board's and objectors' density concerns was "weakened" by the fact that the application complied with the Ordinance's requirements.

> The Ordinance is silent as to density. Similarly, the Ordinance places no limit on the number of duplexes permitted. Yet, the Board is attempting to write in a density provision to bar this project from moving forward. While the Board claims the proposed use is inconsistent with the character of the neighborhood, duplexes, a form of single-family residences, are permitted by special exception in the RS District. "[T]here is a 'presumption' that the use is a 'conditionally permitted use,' legislatively allowed if the [objective] standards are met." The objectors failed to present sufficient evidence to rebut this presumption.

*Id.* at 484-85 (citations and footnotes omitted).

As outlined above, Section 190-402 of the Township's Zoning Ordinance defines the purpose of the RR Zoning District, "to provide land for continuing agricultural operations, resource management, timber harvesting, outdoor recreation, public and private conservation areas, *low-density single-family*

28

*residential*, and compatible support uses." (Emphasis added.) In turn, Section 190-407(A) of the Township's Zoning Ordinance states, "The purpose of the MEO [] District is to provide areas for the extraction of minerals as defined by the Commonwealth, *where the population density is low and significant development is not projected for the near future*." (Emphasis added.)

In *Protect PT v. Penn Township Zoning Hearing Board*, 220 A.3d 1174, 1195-96 (Pa. Cmwlth. 2019), in which we rejected Objector's substantive validity challenge to the relevant provisions of the Township's Zoning Ordinance, we stated the following, in relevant part:

> Notably, the [RR] District primarily addresses resource management, not residential development. In addition, the MEO District does not *blanket* the [RR] District. Rather, the MEO District specifically excludes areas of dense residential and commercial activity. The MEO District also increases some of the state-imposed setbacks. As a result of the increased setbacks, [unconventional gas drilling (UNGD)] is limited to less than 10% of the Township.

> The purpose of an overlay district is to craft provisions that conserve natural resources or realize development objectives without unduly disturbing the expectations created by the existing zoning district. The MEO District meets those objectives by providing for the preservation of agricultural operations and development opportunities for owners of mineral resources. In creating the MEO District, the Township properly balanced the rights of property owners seeking to develop their mineral resources with the need to ensure the health, safety and welfare of neighboring community members and property owners.

> Furthermore, in the MEO District, 77.9% of the land is under oil and gas leases. In *Gorsline* [*v. Board of Supervisors of Fairfield Township*, 186 A.3d 375, 389 (Pa. 2018) (*Gorsline II*)], our Supreme Court determined

29

that municipalities are empowered to permit oil and gas development in any or all of its zoning districts. The *Gorsline II* Court, rather than relegating UNGD solely to industrial zones, instead noted that its decision should not be misconstrued as an indication that UNGD was fundamentally incompatible with agricultural and residential zoning districts. As discussed above, in *Frederick* we upheld the [board's] determination that the objectors failed to prove that the zoning ordinance (which allowed UNGD in every zoning district) violated substantive due process. Regardless of the zoning district, we observed in *Frederick* that UNGD must satisfy exacting standards designed to protect neighboring property owners from cognizable injury.[13]

---

[13] *See Frederick*, 196 A.3d at 690 n.20 ("Objectors call oil and gas drilling 'industrial' throughout their briefs. Objectors presented no evidence to the Board on what they meant by 'industrial' or the significance of that term. . . . Farming uses heavy machinery; in this respect it also contains components of an 'industrial use.'"). *See also Delaware Riverkeeper Network v. Middlesex Township Zoning Hearing Board* (Pa. Cmwlth., No. 2609 C.D. 2015, filed June 26, 2019), slip op. at 18 n.16, *appeal denied*, 222 A.3d 385 (Pa. 2019), in which we explained:

> The General Assembly has also recognized the compatibility between agricultural and oil and gas development uses in other contexts. *See* Section 14.1(c)(6)(i) of the Agricultural Area Security Law, Act of June 30, 1981, P.L. 128, *as amended*, added by Act of December 14, 1988, P.L. 1202, 3 P.S. §914.1(c)(6)(i) ("An agricultural conservation easement [purchased by the State Agricultural Land Preservation Board] shall not prevent . . . [t]he granting of leases . . . or the issuing of permits . . . for the exploration, development, storage or removal of . . . oil and gas by the owner of the subject land or the owner of the underlying . . . oil and gas or the owner of the rights to develop the underlying . . . oil and gas, or the development of appurtenant facilities related to . . . oil or gas development or activities incident to the removal or development of such minerals."); Section 6(c.1)(1) of the Pennsylvania Farmland and Forest Land Assessment Act of 1974, Act of December 19, 1974, P.L. 973, *as amended*, 72 P.S. §5490.6(c.1)(1) ("Land subject to preferential assessment may be leased or otherwise devoted to the exploration for and removal of gas and oil, including the extraction of coal bed methane, and the development of appurtenant facilities, including new roads and

**(Footnote continued on next page…)**

30

Here, unlike *Frederick*, UNGD is permitted only in the MEO District, and only by special exception. As noted above, the trial court determined that UNGD is compatible with, and even beneficial to, the rural uses permitted in the [RR] District. Although low-density residential properties are permitted in the [RR] District, resource development uses are also permitted. [Objector] failed to present any credible evidence indicating UNGD would be harmful to the health, safety or welfare of properties neighboring UNGD operations. [(Emphasis in original and citation omitted).]

In sum, Objector failed to present sufficient credible evidence to rebut the Board's conclusion that "Applicant has produced evidence to show that its operation, subject to certain conditions, will satisfy the requirements of Article VI, §190-641(D) of the Ordinance and Article I, Section 27 of the Pennsylvania Constitution." R.R. at 489a. Because the Board found that the proposed development meets the objective requirements of the Ordinance based on the substantial and uncontested evidence, and because Objector did not present credible evidence rebutting this determination, the Board did not err in rejecting Objector's claim that the application for a special exception should be denied based on the purported cumulative negative impact of the proposed oil and gas development at the Gaia Well Pad site. *Marr Development Mifflinville, LLC*.

## IV.

Finally, Objector claims that the conditions that the Board imposed in granting the application do not comport with its mandate under Article I, Section

---

**(continued…)**

bridges, pipelines and other buildings or structures, related to exploration for and removal of gas and oil and the extraction of coal bed methane."). (Citation omitted.)

31

27 of the Pennsylvania Constitution[14] to prohibit the degradation, diminution, and depletion of the public natural resources. However, we note that Objector's Statement of Questions Involved portion of its appellate brief states:

> Did the Board err as a matter of law or abuse its discretion when it determined that objecting parties failed to establish sufficient credible evidence that if the proposed use is granted it would create a high probability of an adverse, abnormal or detrimental effect to the public health, safety and welfare.

Appellant's Brief in Support of Appeal at 4.

Pa. R.A.P. 2111(a)(4) provides, in pertinent part that "[t]he brief of the appellant . . . shall consist of the following matters, separately and distinctly entitled and in the following order: . . . Statement of the questions involved." In turn, Pa. R.A.P. 2116(a) states, in relevant part:

> The statement of the questions involved must state concisely the issues to be resolved, expressed in the terms and circumstances of the case but without unnecessary detail. The statement will be deemed to include every subsidiary question fairly comprised therein. No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby.

As outlined above, Objector did not raise a constitutional challenge to the Board's action in this matter in the Statement of Questions Involved portion of

---

[14] Pa. Const. art. I, §27. Article I, Section 27 states:

> The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

32

its appellate brief. As a result, any claim regarding a purported violation of Article I, Section 27 of the Pennsylvania Constitution has been waived for purposes of appeal. Pa. R.A.P. 2116(a).[15]

Moreover, assuming that Objector has properly preserved this claim for our review, we specifically rejected the identical argument in *Apex* stating, in relevant part:

> []Objector maintains the [Board] did not uphold its constitutional duty to protect the environmental rights of the Township's residents as required by Article I, Section 27 of the Pennsylvania Constitution. In support, it references our Supreme Court's decisions in *Pennsylvania Environmental Defense Foundation v. Commonwealth*, 161 A.2d 911 (Pa. 2017) (declaratory judgment suit brought by environmental advocacy entity, challenging constitutionality of statutory enactments relating to funds generated from leasing of state forest and park lands for oil and gas exploration and extraction), and *Robinson Township v. Commonwealth*, 83 A.3d 901 (Pa. 2013) (suit for declaratory and injunctive relief challenging constitutionality of [Act No. 13 of February 14, 2012, P.L. 87], amending the [Oil and Gas Act]). Clearly, those cases, which involved constitutional challenges, are distinguishable in that this case does not involve a constitutional or substantive validity challenge. Rather, this case involves applications for uses permitted by special exception, and appellate review of the [Board's] application of the

---

[15] *See also Robinson Township v. Commonwealth*, 147 A.3d 536, 585 n.60 (Pa. 2016) ("[B]efore our Court, Citizens did not preserve a discrete claim based on Section 204(a) [of the Eminent Domain Code, 26 Pa. C.S. §204(a),] in their statement of the questions involved in their brief, nor pursue it in their argument; hence, we deem the question of the applicability of Section 204(a) waived for purposes of this appeal."); *Commonwealth v. Lynn*, 71 A.3d 247 (Pa. 2013) ("Respondent did not appeal the careless driving conviction to the Superior Court by raising it . . . in his Statement of Questions Involved in his brief; therefore, the issue was waived and was not properly before that court. Pa. R.A.P. . . . 2116(a) (no question will be considered unless stated in statement of questions involved or fairly suggested thereby).").

33

zoning ordinance's special exception criteria to the facts presented.

Moreover, contrary to Objector's assertions, Applicant's proposed unconventional gas well operations are permitted by special exception in the MEO District, which evidences a legislative decision that the uses are consistent with the zoning plan and presumptively consistent with the health, safety and welfare of the community. *Greth* [*Development Group, Inc. v. Zoning Hearing Board of Lower Heidelberg Township*, 918 A.2d 181, 188 (Pa. Cmwlth. 2007)]. In light of the fact that Objector presented no credible evidence of harm, Objector's claims are unsupported by the *accepted* evidence of record. Further, as explained above, the [Board] attached several detailed conditions to the grant of the special exceptions in order to mitigate adverse effects associated with Applicant's proposed unconventional gas drilling uses.

*Id.*, slip op. at 30-31 (emphasis in original).[16] As a result, Objector's claim of a purported constitutional violation is likewise without merit.

Accordingly, the trial court's order is affirmed.

_____
MICHAEL H. WOJCIK, Judge

---

[16] *See also Protect PT*, 220 A.3d at 1197-98 ("By failing to show with credible evidence that UNGD would adversely affect neighboring property owners in the [RR] District, [Objector] failed to establish that the Zoning Ordinance '*unreasonably impairs*' the rights of Township residents under [Article I, Section 27]. *See Frederick*, 196 A.3d at 697 (emphasis added).").

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Protect PT,                          :
                                   :
                Appellant     :
                                     :
              v.                    :   No. 575 C.D. 2019
                                     :
Penn Township Zoning Hearing      :
Board and Olympus Energy LLC     :

# **O R D E R**

AND NOW, this 6th day of July, 2020, the order of the Westmoreland County Court of Common Pleas dated April 9, 2019, is AFFIRMED.

_____

MICHAEL H. WOJCIK, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Protect PT,                              :
             Appellant            :
                                     :    No. 575 C.D. 2019
        v.                    :
                                     :    Argued:  February 13, 2020
Penn Township Zoning Hearing             :
Board and Olympus Energy LLC             :


BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge
             HONORABLE MICHAEL H. WOJCIK, Judge **(P.)**
             HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


***OPINION NOT REPORTED***

CONCURRING OPINION
BY JUDGE McCULLOUGH                                    FILED:  July 6, 2020


        I concur in the result reached by the Majority because faithful adherence to our prevailing precedent compels it.  *See generally Protect PT v. Penn Township Zoning Hearing Board*, 220 A.3d 1174 (Pa. Cmwlth. 2019); *Frederick v. Allegheny Township Zoning Hearing Board*, 196 A.3d 677 (Pa. Cmwlth. 2018) (en banc), *appeal denied*, 208 A.3d 462 (Pa. 2019).  I do so reluctantly, though, based upon the reasoning that I have previously expressed with regard to the fundamental issues, underlying premises, and legal conclusions that constitute that prevailing precedent.

        Overall, the oil and gas industry is a longstanding, integral, and important business to the residents of Pennsylvania.  My concern, however, is that judicial review in matters such as the one presently before the Court has been

severely reduced to a point where this Court functions merely to ascertain whether a zoning hearing board found the objector's evidence credible. Here, Protect PT (Objector) presented both layperson and expert testimony. Most significantly, one expert based his opinion on peer review literature and an analysis of the specific details of the Gia Well Pad construction and its capabilities and opined that the Township and its residents would suffer detrimental harm. *See* Reproduced Record (R.R.) at 501a-09a.

I do not in any way—and I emphasize *any*—suggest that the Penn Township Zoning Hearing Board (or any board) has not, cannot, and will not assume and fulfill their tremendous responsibility as a fact finder in the most honorable and principled manner. My concern, instead, lies in the legal framework employed to address, analyze, and dispose of the issues discussed above.

Having made these observations, I respectfully concur in the result reached by the Majority.

_____
PATRICIA A. McCULLOUGH, Judge